UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-80280-CIV-MARRA/JOHNSON

NORRIS HEAD, LOLITHA HEAD, DERRICK
PINDER, NORRIS HEAD III and NYJAH HEAD,

              Plaintiffs,

vs.

CORNERSTONE RESIDENTIAL MANAGEMENT,
INC., and PORTOFINO ASSOCIATES LTD d/b/a
PORTOFINO APARTMENTS,

              Defendants.
_____/

**ORDER AND OPINION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

THIS CAUSE is before the Court upon Defendants' Motion for Summary

Judgment [DE 74 ].  The motion is fully briefed and ripe for review.  The Court has

carefully considered the relevant filings, the entire court file, and is otherwise fully

advised in the premises.

**Introduction**

The Plaintiffs Norris Head ("Head") and Lolitha Head are parents of three

children, Plaintiffs Derrick Pinder, Norris Head III, and Nyjah Head.  The Defendant,

Portofino Associates, Ltd. d/b/a Portofino Apartments ("Portofino") is a Florida

Limited Partnership and is part of an integrated enterprise with defendant

Cornerstone Residential Management, Inc. ("CRM").  Compl. ¶ 7.  Portofino is a 240-

unit multifamily low-income rental community managed by CRM.  Compl. ¶¶ 4-8.

Count A of the Complaint alleges familial discrimination and violation of the federal and Florida Fair Housing Acts when Defendants printed and promulgated discriminatory occupancy standards for renting at Portofino and all CRM rental communities.[1]  Compl. ¶ 50.  Count II alleges that Defendants' actions in requiring all adult members of a family to have adequate credit, when one or more members have sufficient credit to rent an apartment, violate Florida's Deceptive and Unfair Trade Practices Act, § 501.204, Fla. Stat.  Compl. ¶ 59.  On January 18, 2010, the Court granted Defendants' Motion for Judgment on the Pleadings and dismissed Count III of the Complaint alleging violations of the Fair Credit Reporting Act.  *See* DE 79.  Count IV, the final count, alleges violations of 42 U.S.C. § 3617 and § 760.37, Fla. Stat. because Defendants allegedly refused to accept rent from Plaintiffs and evicted them in total and reckless disregard of their federally protected rights.  Compl. ¶ 76.

---

[1]  This case alleges the same issues and pattern of discrimination alleged in *Milsap v. Sanctuary Cove, et al.*, Case No. 05-60033-CIV-MARRA.  Compl. ¶ 3.  That case has settled and is closed.

**Undisputed Facts**[2]

1.      Cornerstone Residential Management, Inc. was the property manager for

        Portofino Apartments, an affordable housing community.  Portofino is the

        owner of Portofino Apartments.  Answer, ¶ 9.

2.      Portofino developed Portofino Apartments with financing through the Florida

        Housing Finance Corporation ("FHFC")[3] and therefore is subject to FHFC

        regulations.  FHFC's regulations and guidelines (which also incorporate by

        reference certain United States Department of Housing and Urban

        Development ("HUD") regulations) set eligibility standards for occupants of

        affordable housing projects and provide guidance to the owners.  DE 104, HUD

        Handbook § 1-2(B).

───────────────────

[2]  These facts come from Defendants' concise statement of material facts as to
which Defendants contend there exists no genuine issue to be tried.  S.D. Fla. L.R.
7.5(A).  Statements of material facts submitted in opposition to a motion for
summary judgment **must** correspond with the order and with the paragraph
numbering scheme used by the movant.  S.D. Fla. L.R. 7.5(C)(3) (emphasis added).
All material facts set forth in the movant's statement filed and supported as required
by Local Rule 7.5(C) are deemed admitted unless controverted by Plaintiffs'
statement of facts.  S.D. Fla. L.R. 7.5(D).  In this case, Plaintiffs' statement of
disputed facts completely ignores Defendants' statement, disregards Local Rule
7.5(C)(3), and is an independent list of facts they contend are genuinely in dispute.
Unless a particular undisputed fact from Defendants is directly addressed by
Plaintiffs, Defendants' statements which are supported by evidence in the record, are
deemed admitted.

[3]  Florida Housing Finance Corporation is the statutorily-created agency
responsible for the allocation and distribution of tax credits to Florida applicants.
*Holly Ridge Ltd. Partnership v. Pritchett*, 936 So.2d 694, 695 -96 (Fla. Dist. Ct. App.
2006).

3.   FHFC and HUD regulations require each adult in a household/family who will reside in affordable housing to complete an application for occupancy.  DE 74, Ex. G., M. Simpson Depo. at 38-39.  Applications must be completed before the household/family obtains benefits.  DE 74, Ex. C, HUD Handbook,[4] § 3-11.  HUD regulations require that owners screen each applicant's criminal and civil background as well as immigration status.  The HUD Handbook also provides suggestions for other ways to screen potential occupants.  DE 74, Ex. C, HUD Handbook, § 4-7.

4.   When a person joins a household/family after its initial certification of eligibility, that person must complete an application for residence and undergo the same screening.  *Id.*, HUD Handbook, § 3-16.  If that person is not eligible to reside in affordable housing, it disqualifies the entire household or family. DE 74, Ex. G., M. Simpson Depo. at 36.  Each household/family must be re-certified annually prior to lease renewal.  DE 74, Ex. C, HUD Handbook, Chapter 7.  CRM abides by this regulation at Portofino Apartments.  Ex. G, M. Simpson Depo. at 34-35.

5.   In accordance with FHFC/HUD regulations, Defendants published and distributed a document called "Objective Rental Standards" to inform applicants of the standards that they must meet to be eligible for residence at

_____

[4]  HUD Handbook 4350.3:  Occupancy Requirements of Subsidized Multifamily Housing Programs.

Portofino Apartments.  DE 74, Ex. A.  Among other things, the Objective Rental Standards provide that Defendants will screen applicants' credit histories and that an applicant will be rejected based on unpaid debts or poor payment history.  The Objective Rental Standards also state that the maximum occupancy of a two bedroom apartment is four people.  *Id.*

6.    It was CRM's policy that if an applicant owed a debt to a prior landlord, the application would be denied automatically.  DE 74, Ex. G, M. Simpson Depo. at 29.

7.    Head, a high school teacher relocating from Tallahassee, came to visit Portofino Apartments to inquire about residency and availability sometime before he actually applied.  DE 74, Ex. G, N. Head Depo. at 22-26.

8.    Head returned to Portofino Apartments on January 26, 2004, to apply for a two bedroom apartment and signed a copy of the Objective Rental Standards.  DE 74, Ex. A.  Head completed and signed the application, indicating that he was "single," and listed the occupants of the apartment as himself and two sons, ages 10 and 7 months.  DE 74, Exs. A, G, L. Head Depo. at 14, M. Simpson Decl., April 14, 2005, ¶ 5.

9.    Head was married to Lolitha Head at the time of his application.  DE 74, Ex. G, N. Head Depo. at 34, 41-42.  He anticipated that he and his wife would reconcile.  DE 74, Ex. G, N. Head Depo. at 48.

10.     Among other things, Defendants obtained verification of Head's employment, ran criminal and civil background checks, and pulled his credit report.  Head was approved for occupancy and entered into a one-year lease at Portofino on February 4, 2004.  DE 22 at 1.

11.     During the course of Head's lease, Lolitha Head moved into the apartment without completing an application for occupancy.  DE 74, Ex. G, N. Head Depo. at 55, L. Head Depo. at 31-33.  She had been visiting Head "frequently" since February, 2004.  *Id.*, N. Head Depo. at 56.

12.     Lolitha Head had a poor credit history with many outstanding debts, including a four-year old debt owed to a prior landlord at a community called Polo on the Park.  DE 74, Ex. D.  She was aware that the debt to Polo on the Park was on her credit report.  DE 74, Ex. G, L. Head Depo. at 38.

13.     In October, 2004, CRM sent Head a letter advising him that the time was approaching for him to come by the management office to apply for re-certification.  Head did not respond.  Another such letter was sent the following month.  DE 74, Ex. B.  Head did not respond to that letter either.  DE 74, Ex. G, N. Head Depo. at 61-62.

14.     On November 11, 2004, Norris and Lolitha Head had a baby girl named Nyjah Head.  DE 22 at 2.

15.     On or about December 28, 2004, a CRM staff member visited Head's apartment.  The staff member rang the doorbell and a woman answered.  The

staff member asked the woman to tell Head that he must come to the management office.  DE 74, Ex. G, M. Simpson Depo. at 59-60.

16.   Later that day, Head came to the management office and spoke to Assistant Property Manager Misty Simpson.  DE 74, Ex. G, N. Head Depo. at 65.  Ms. Simpson asked Head for the identity of the woman who answered his door and was informed that she was Head's wife, Lolitha Head.  He also advised Ms. Simpson that the couple had a new baby, Nyjah Head.

Ms. Simpson told Head that because Lolitha was an adult occupant of the unit, she would have to fill out an application for occupancy, undergo screening and her name would have to be on the lease.  DE 74, Ex. G, M. Simpson Decl., April 14, 2005, ¶ 8.  Ms. Simpson also advised Head that because he now had five persons living in a two bedroom apartment, he would have to consider moving to a three bedroom apartment.  *Id*.

17.   Head learned from a neighbor, Ruben Salcedo, that management had requested that his live-in girlfriend make an application to be listed on the lease, but she had not complied.  DE 83, Ex. 4, N. Head Depo. at 95.  Later, she moved out.  DE 74, Ex. G, L. Head Depo. at 50.[5]

---

[5]  It is Head's understanding that another neighbor, Bernard Bush, was the only one on his lease, but his girlfriend, her disabled child and an adult daughter lived with him.  DE 83, Ex. 4, N. Head Depo. at 89.  It is Lolitha Head's understanding that Bush's girlfriend never had her credit checked and that she had "awful credit" and a felony criminal record.  DE 74, Ex. G, L Head Depo. at 52-56.  This "evidence" is not based on personal knowledge and necessarily is based upon hearsay.  *See* n.13 *infra.*

18.     Lolitha Head went to the management office that day and filled out an

application for occupancy.  She signed a copy of the Objective Rental

Standards.  Criminal and civil background checks were run on Lolitha Head as

well as her credit report.  The credit report showed several debts, including

the four-year old debt to Polo on the Park, an apartment community in

Tallahassee, Florida.  DE 74, Ex. D (credit report); Ex. G, M. Simpson Decl.,

April 14, 2005, ¶¶ 9-11.

19.     Norris and Lolitha Head lived together at Polo on the Park and they knew they

were behind on the rent when they left.  DE 74, Ex. G, L. Head Depo. at 10-11;

N. Head Depo. at 86.

20.     Either on December 29, 2004 or January 10, 2005, Norris and Lolitha Head were

informed that the lease at Portofino Apartments would not be renewed.  DE

74, Ex. G, N. Head Depo. at 65, 82.  They were told the reason for the non-

renewal was Lolitha Head's poor credit history.  DE 74, Ex. G, N. Head Depo. at

82, L. Head Depo. at 11-12.

---

Therefore, this evidence cannot be considered on a motion for summary judgment.
*Macuba v. Deboer*, 193 F.3d 1316, 1322 -23 (11th Cir. 1999).  Rule 56(e) of the Federal
Rules of Civil Procedure requires that "affidavits" that support or oppose summary
judgment motions "shall be made on personal knowledge, [and] shall set forth such
facts as would be admissible in evidence."  Defendants maintain that all adults living
in the Bush unit were on the lease, but no record cite is provided for this assertion.
Without any evidence on either side, the Court will disregard the assertions of both
parties regarding the Bush family.

21.     On January 12, 2005, Head received a letter informing him that he must vacate the two bedroom apartment by January 31, 2005.  DE 74, Ex. B.  He asked for more time.  DE 74, Ex. G, N. Head Depo. at 86-87.

22.     On January 17, 2005, CRM wrote to Head to inform him that it would extend the date to vacate until February 28, 2005.  It provided, "[b]ased on the initial notification that was dated and delivered December 29, 2004, we are allowing 60 days to make arrangements regarding other residency.  It is understood that this is in excess to the 30 days that is normally given to residents that are not renewing."  DE 74, Ex. B.  Norris and Lolitha Head were requested to sign and return a confirmation that they would vacate no later than February 28, 2005.  They never signed or returned the form.  DE 74, Ex. G, N. Head Depo. at 88-89.

23.     On February 7, 2005, CRM sent Head a letter which explained that an option which would allow the family to continue residing at Portofino Apartments was for them to "clean" Lolitha Head's credit report by resolving the debt owed to Polo on the Park and producing proof that she had resolved the claim.  The Head's then could re-apply for occupancy.  The letter also informed the Heads that they would "have to upgrade to a three bedroom apartment" because there were more than four persons in the two bedroom apartment.  The letter informed Head that rent for February would not be accepted until he notified the management office of his intentions going forward in this "serious matter." DE 74, Ex. B.

24.   Norris Head was orally notified by CRM that the statement in the February 7, 2005 letter telling them that they must move to a three bedroom apartment was a mistake.  DE 74, Ex. G, N. Head Depo. at 111-12; DE 94, Ex. A, N. Head Decl. ¶ 12.  The Head family was never required to move out of the two-bedroom and into a three-bedroom apartment.  DE 74, Ex. G., N. Head Depo. at 111.

25.   Head was aware he had to notify the management office of his intentions to pay off Lolitha Head's debt, but he did not do so.  *Id*. at 101.

26.   Lolitha Head filed a charge of "marital status" discrimination with the Palm Beach County Office of Equal Opportunity on February 15, 2005.  *Id*. at 103, 121; L. Head Decl. ¶ 5.

27.   The charge of discrimination was received by CRM on or around February 17, 2005.  CRM responded to the charge of discrimination on February 21, 2005 asserting that the Head family was not eligible to reside at Portofino Apartments.  DE 74, Ex. E.

28.   Head and his family did not vacate Portofino Apartments on February 28, 2005.

29.   On March 2, 2005, Portofino received a letter from attorney Cathy Purvis Lively questioning the non-renewal of Head's lease and inviting discussion without litigation.  DE 74, Ex. F.  On March 11, 2005, Defendants' attorneys responded to Ms. Lively and informed her that the Head family did not qualify to reside at Portofino Apartments because of Lolitha Head's poor credit.  *Id*.  The letter

asked Ms. Lively to contact the Head's and determine their ability to pay off

Lolitha Head's debts so that they could remain residents at Portofino.  *Id*.

30.    Neither the Heads nor Ms. Lively responded to the March 11, 2005 letter.  *Id*.

Therefore, on March 15, 2005, CRM posted a three day notice of intent to evict

on Head's apartment door.  DE 74, Ex. F.

31.    On March 21, 2005, CRM's counsel sent a second letter to Ms. Lively giving the

Heads until close of business to tender rent and agree to the option of

repairing Lolitha Head's credit.  *Id*.  Neither the Heads or Ms. Lively

responded.  DE 74, Ex. G, M. Simpson Decl., April 14, 2005, ¶ 18.

32.    On March 24, 2005, attorney Matthew Dietz contacted Defendants' attorney to

advise them of his representation of the Heads.   DE 74, Ex. F

33.    On March 25, 2005, Portofino filed its eviction action against Head in Palm

Beach County Court.  *Id*.

34.    The instant lawsuit was filed on April 4, 2005.  DE 1.  Head knew by this point

that CRM was not going to make his family move into a three bedroom

apartment.  DE 74, Ex. G, Head Depo at 140-41.

35.    There was a waiting list for two bedroom units at Portofino as of April 14,

2005.  M. Simpson Decl., April 14, 2005, ¶ 20.

36.    On April 28, 2005, the eviction case was heard in Palm Beach County Court.

The parties were referred to mediation and entered into a settlement which

provided additional time for Lolitha Head to resolve the debt owed to her prior

landlord.  Ex. F.  Head signed an affidavit that he would "endeavor to satisfy

or remove from credit report the amount claimed by Polo on the Park

Apartment on or before January 31, 2006."  Ex. F.  Head also agreed that his

failure to provide proof of payment of the debt would result in non-renewal of

his lease.  *Id.*

37.    Head never provided proof of satisfaction of the debt to Polo on the Park.

38.    Defendants issued a non-renewal notice in October, 2005.  DE 83, Ex. 11.

39.    The Head family continued to reside in the same two bedroom apartment until

they moved on December 29, 2005.  DE 74, Ex. G, N. Head Depo at 111; DE 83,

Ex. 12.

## Standard of Review

Summary judgment is proper if following discovery, the pleadings, depositions,

answers to interrogatories, affidavits and admissions on file show that there is no

genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986);

Fed.R.Civ.P. 56.  All evidence and all factual inferences reasonably drawn from the

evidence are viewed in the light most favorable to the nonmoving party.  *Adickes v.

S.H. Kress & Co.*, 398 U.S. 144 (1970); *Stewart v. Happy Herman's Cheshire Bridge,

Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997).  Judgment in favor of a party is proper

where there is no legally sufficient evidentiary basis for a reasonable jury to find for

the nonmoving party on the issue before the Court.  Fed.R.Civ.P. 56.

**Discussion**

**A.      The Federal and Florida Fair Housing Acts**

Count A of the Complaint alleges familial discrimination and violation of the federal and Florida Fair Housing Acts when Defendants printed and promulgated discriminatory occupancy standards for renting at Portofino.  Compl. ¶ 50.  Plaintiffs further argue, "[t]he February 7, 2005, letter from Portofino [requiring the Heads to move to a three bedroom apartment] is evidence of discrimination based upon familial status."  DE 84 at 8.  Plaintiffs assert that there is no evidence that Defendants rescinded their decision to require the Heads to move into a three bedroom apartment immediately after the February 7th letter was sent.  "There was never any paperwork sent to them regarding the decision, despite their request to have this action in writing."  DE 94 at 1.

Defendants make two arguments why any claims asserted pursuant to the Florida Fair Housing Act ("FFHA"), Florida Statutes Chapter 760,[6] should be dismissed: (1) failure to exhaust administrative remedies; and (2) because Plaintiffs cannot establish a prima facie violation of either the federal or Florida Fair Housing Acts. The issue of exhaustion of administrative remedies in this context has been comprehensively addressed in a previous order of this Court.  *See, Milsap, et al.  v. Cornerstone Residential Management, Inc., et al.*, Case No. 05-60033, DE 405.  As

---

[6]  *See* Count A (familial status discrimination) and Count IV (interference, coercion, or intimidation).

previously concluded, exhausting administrative remedies is not a prerequisite to filing a claim under the FFHA. *Id.* at 8.

Enacted as Title VIII of the Civil Rights Act of 1968, the Fair Housing Act ("FHA") originally barred discrimination in housing on the basis of race, color, religion, or national origin. Congress added gender as a protected class in 1974. In 1988, Congress amended the FHA to prohibit discrimination based on handicap and familial status. *See* Fair Housing Amendments Act of 1988, Pub.L. No. 100-430, 102 Stat. 1619 (1988). The purpose of the FHA,[7] as expressed by Congress, is "to provide, within constitutional limitations, for fair housing[8] throughout the United States." 42 U.S.C. § 3601.

To prove familial-status discrimination, Plaintiffs must show that Defendants discriminated against them "in the terms, conditions, or privileges of ... rental of a dwelling ... because of familial status...." 42 U.S.C. § 3604(b). Familial status is

---

[7] Florida's Fair Housing Act is the state counterpart to the Federal Fair Housing Act Amendments. The FFHA is patterned after the FHA and courts have recognized that it is to be construed consistently with federal law. *See Dornbach v. Holley*, 854 So.2d 211, 213 (Fla. Dist. Ct. App. 2002) ("The Florida Legislature essentially codified the Federal Act when it enacted the Florida Fair Housing Act."); *Loren v. Sasser*, 309 F.3d 1296, 1300 n.9 (11th Cir. 2002) ("The Florida Fair Housing Act contains statutory provisions that are substantively identical to the Federal Fair Housing Act.") Since both Act's statutory provisions are substantively identical, this Court's analysis as to the federal act applies to Plaintiffs' claims pursuant to FFHA as well.

[8] Under the FHA it is unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a).

defined, in short, as one or more children (under 18 years of age) living with a parent or legal guardian.  42 U.S.C. § 3602(k)(1).  Section 3604(b) thus operates to prohibit landlords from refusing to rent to (or from evicting) a person because that person has children living with them.  *Woodard v. Fanboy, L.L.C.*, 298 F.3d 1261, 1265 (11th Cir. 2002).

To establish a prima facie case of familial discrimination,[9] Plaintiffs must show: (1) that they are a member of a protected class under the FHA; (2) that they were qualified to receive low-income housing assistance; (3) that they were denied housing or evicted despite their qualifications; and (4) that the defendants continued to approve other similarly situated applicants for low-income housing assistance.  *See Binns v. City of Marietta Housing Assistance Program*, Case No. 07-CV-0070-RWS, 2010 WL 1138453, *7 (N.D. Ga. March 22, 2010); *Sallion v. SunTrust Bank*, 87 F. Supp. 2d 1323, 1329 (N.D. Ga. 2000) (setting forth steps needed to prove a prima facie case of discrimination under FHA).

Discrimination claims under the FHA are subject to the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting analysis.  *Massaro v. Mainlands Section 1 & 2 Civic Ass'n., Inc.*, 3 F.3d 1472, 1476 n.6 (11th Cir. 1993).  Under that analysis:

---

[9]  "[T]he elements of a prima facie case are flexible and should be tailored, on a case-by-case basis, to differing factual circumstances." *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1123 (11th Cir. 1993) (quotation marks omitted).

> First, the plaintiff has the burden of proving a prima facie case of discrimination by a preponderance of the evidence. Second, if the plaintiff sufficiently establishes a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its action. Third, if the defendant satisfies this burden, the plaintiff has the opportunity to prove by a preponderance that the legitimate reasons asserted by the defendant are in fact mere pretext.

*United States Dep't of Housing and Urban Dev. v. Blackwell,* 908 F.2d 864, 870 (11th Cir. 1990)(citation omitted).  A plaintiff may proceed under the Fair Housing Act provision prohibiting discrimination on the basis of familial status under either disparate impact[10] or disparate treatment,[11] or both.  42 U.S.C.A. §§ 3602(k), 3604(b).  Plaintiffs here are clearly pursuing a disparate treatment claim.  To prove intentional discrimination, "a plaintiff has the burden of showing that the defendants actually intended or were improperly motivated in their decision to discriminate against persons protected by the FHA."  *Bonasera v. City of Norcross*, 342 Fed. Appx. 581, 584, (11th Cir. 2009) (citation omitted).

---

[10] Establishing a disparate impact prima facie case requires showing, among other things, a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices. *E.E.O.C. v. Joe's Stone Crab, Inc.,* 220 F.3d 1263, 1278 (11th Cir. 2000).

[11] To prevail on a disparate treatment in housing claim, Plaintiffs would have to come forward with evidence that they were treated differently than similarly situated tenants.  *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1216 (11th Cir. 2008); *Hallmark Dev., Inc. V. Fulton County*, 466 F.3d 1276, 1286 (11th Cir. 2006) ("Typically, a disparate impact is demonstrated by statistics.")

Defendants concede that Plaintiffs' status as a married couple with minor children establishes the first element of their prima facie case.  Defendants do not agree, however, that Plaintiffs have raised a genuine issue of material fact as to the second element (that they were qualified to rent at Portofino once Lolitha Head moved in), the third element (that they were evicted despite their qualifications to rent), or the final element (that Defendants approved other similarly situated applicants for low-income housing assistance).  The Court concurs.  Defendants have demonstrated that there are no genuine issues of material fact which can be supported with competent evidence relative to these elements of Plaintiffs' prima facie case.

### Eligibility Criteria for Residence at Portofino

Regulations in the United States Department of Housing and Urban Development Handbook 4350.3:[12]  Occupancy Requirements of Subsidized Multifamily Housing Programs govern the operation of Portofino.  These regulations provide, among other things, eligibility criteria for residence in affordable housing, the manner in which applications for occupancy are processed by an owner, the requirement that each adult resident undergo annual re-certification, and the manner in which a tenancy may be terminated ("HUD Handbook").  DE 74, Ex. C; *see also,* www.in.gov/ihcda/files/ HUD_Occupancy_Handbook.pdf.  HUD regulations require each adult in a household

---

[12]  All references to HUD Handbook 4350.3 are to the version that was in effect in 2005.  This handbook is approximately 800 pages long.

who will reside in affordable housing to complete an application for occupancy before the household obtains benefits.  HUD Handbook § 5-15.  HUD regulations require that owners screen each applicant's criminal and civil background as well as immigration status.  HUD Handbook, § 3-11.  Each household must be re-certified annually prior to lease renewal.  DE 104, HUD Handbook, §§ 7-1, 7-4, and 7-5.

Regarding other permitted screening, the HUD Handbook provides that owners are permitted to screen applicants for suitability to help them determine whether to accept or deny an applicant's tenancy as follows:

> Owners should consider at least developing screening criteria related to the following factors and may establish other criteria not specifically prohibited in paragraph 4-8 below. . .
>
> *     *     *     *     *
>
> 2.     Screening for credit history.  Examining an applicant's credit history is one of the most common screening activities.  *The purpose of reviewing an applicant's credit history is to determine how well applicants meet their financial obligations.  A credit check can help demonstrate whether an applicant has the ability to pay rent on time.*
>
>     a.     *Owners may reject an applicant for a poor credit history,* but a lack of credit history is not sufficient grounds to reject an applicant.
>
>     b.     As part of their written screening criteria, and in order to ensure that all applicants are treated fairly, *owners should describe the general criteria they will use for distinguishing between an acceptable and unacceptable credit rating.  Owners are most often interested in an applicant's credit history related to rent and utility payments.*  A requirement for applicants to have a perfect credit rating is generally too strict a standard.

c.   *Owners may determine how far back to consider an applicant's credit history.  Owners generally focus on credit activity for the past three to five years.*  It is a good management practice to give priority to current activity over older activity.

HUD Handbook, § 4-7(E) (emphasis supplied).

Portofino Apartments had "Objective Rental Standards," which both Norris Head and Lolitha Head read and signed.  DE 74, Ex. A.  These standards comply with HUD guidelines by describing the criteria Portofino will use for distinguishing between an acceptable and unacceptable applicant as follows:

All applicants for residency will be evaluated using the criteria listed below and will receive equal opportunity to obtain an apartment in all buildings. . .

1)   Income will be verified through employment verifications and social security records.  If inaccuracies are noted in the information supplied by the applicant, he/she will be declined.  Applicants will be deemed income qualified based on the following Income Guidelines:

2.5 Times the rent          Total Annual Gross Income

2)   Prior residency will be verified.  *If a prior landlord reports poor payment record*, failure to comply with rules/regulations, failure to maintain unit with sufficient care, or if a previous eviction or lease termination is reported, *the application will be rejected.*

3)   A credit report will be pulled on all adult applicants.  Credit references will be verified by a national credit service.  *If references are reported unfavorable, the application will be rejected.*  The following items will be considered unfavorable credit references:

        a)     Eviction
        b)     Bankruptcy, foreclosures or repossessions
        c)     Unpaid judgments, collections, or liens
        d)     Poor payment record
        e)     Inaccuracies in the application

   4)     A criminal/civil background check will be made on all adult applicants. Any applicant reported having a criminal/civil background would be denied.

Our management company has established the following limits on occupancy at Portofino Apartments:

        One Bedroom:     Maximum of two(2) people
        Two Bedroom:     Maximum of four (4) people
        Three Bedroom:   Maximum of five (5) people

*    *    *    *    *

DE 74, Ex. A (emphasis supplied).  In accordance with Objective Rental Standard (3) above, any time an applicant owed a debt to a prior landlord, the application for residency was automatically denied by CRM.  DE 74, Ex. G, M. Simpson Depo. at 29. When an application for residency is denied because of the credit check, CRM has an established practice for notifying the applicant.  This practice was in effect when Norris Head applied for re-certification and Lolitha Head applied for residency in December, 2004.  DE 74, Ex. G, Simpson Decl. May 21, 2009, ¶ 2.  The practice consists of a member of the management office running a credit check on the prospective tenant through an on-line service called First American Registry.  *Id*. ¶ 3.  The determination of whether a prospective tenant qualifies is made by First American Registry.  If First American Registry determines that a prospective tenant does not qualify for residence at Portofino, a letter of denial is automatically printed out in the management office.  *Id*.

CRM then either mails the letter to the applicant's last known address or personally hands it to person if he or she is in the office.  CRM would explain to the prospective tenant what he or she could do about the credit entry.  Misty Simpson consistently followed this practice.  *Id*.  Indeed, Ms. Simpson distinctly remembers sitting with Norris and Lolitha Head in the management office and explaining to them that Lolitha Head's application for residency had been denied because of entries on her credit record, including a debt to a former landlord.  *Id*. ¶ 5.

HUD guidelines unequivocally permit owners to reject applicants with a poor credit history or with a debt to a prior landlord.  HUD also provides that debts as old as five years may properly be considered.  It is also standard procedure when a person joins a household/family after its initial certification of eligibility, that the person must complete an application for residency and undergo the same screening process before they move in.  DE 104, HUD Handbook, §§ 3-11(B)(2) and 3-15; DE 74, Ex. C, FHFC Ch. 4(2).

Plaintiffs bring this case because they feel singled out and because it makes no sense that their family should be denied residency just because Lolitha Head had an old debt while Norris Head qualified for residency.  DE 84 at 2-3, N. Head Decl. ¶ 23.  Plaintiffs argue, "[i]t is undisputed that the Heads were qualified as Norris had been living at Portofino Apartments and paying his rent timely, and since their employment status and income had not changed there was no question as to whether they continued to be income qualified to remain in Portofino in a two bedroom apartment."  DE 84 at 5.

Plaintiffs state that they bring this familial discrimination claim, in part, because Lolitha Head's debt to her prior landlord disqualified the entire family from living at Portofino even though Norris Head had been paying rent on a timely basis.  Plaintiffs reassert that Portofino's actions "make no sense," all the while ignoring the fact that:

- Norris and Lolitha Head lived together in Tallahassee at Polo on the Park and both knew they were behind on the rent when they left;

- When Head first applied for residency he indicated that he was single when he was in fact married;

- Lolitha Head moved in without notifying Portofino or being cleared by them as required by HUD; and

- The Heads agreed in a mediated settlement that they would take care of the Polo on the Park debt as a condition of remaining at Portofino.

DE 84 at 3, 9, 10, 11, 13.

The fact that Portofino's actions make no sense to Plaintiffs is an insufficient basis to state a violation of the FFHA or the FHA.  HUD directives provide that an owner must consider a family ineligible unless all of its adult members sign applicable consent and verification forms.  HUD Handbook § 3-11.  It does not matter whether the adults report income or not.  Owners are required to determine eligibility before approving an applicant for tenancy.  *Id.*  Because there is no genuine issue of material fact that Plaintiffs cannot establish the second element of their prima facie case, *i.e.*, that they were qualified to rent at Portofino once Lolitha Head moved in, summary judgment must be entered as to this element.

**There is No Competent Evidence, Sufficient to Create a Genuine Issue of Material Fact, that the Heads Were Evicted Despite Their Qualifications**

The third element of Plaintiffs' prima facie case requires that there be a genuine issue of material fact regarding whether Plaintiffs were evicted despite their qualifications to rent at Portofino.  Since the Court finds, as a matter of law, that Plaintiffs were not qualified to live at Portofino, there is no need to further examine this element.  But Plaintiffs state that they bring this familial discrimination claim, in part, because they were told they had to move into a larger, more expensive apartment since they were a family of five, and they were never provided written confirmation that this requirement had been rescinded.

The undisputed record evidence demonstrates that even though Portofino initially told the Heads that they had to move into a three bedroom apartment, this requirement was rescinded, the Heads never moved from the two bedroom unit, and the initial notification that they had to move was not a basis for the eviction.  There is no evidence to the contrary.  The Plaintiffs do not provide evidence - either direct or circumstantial - from which a reasonable jury could conclude by a preponderance of the evidence that the decision not to renew Plaintiffs' lease was based, at least in part, on impermissible discrimination against families with children.  Indeed, the agreement entered into by the parties that settled the eviction action allowed the Heads to remain in the unit they were occupying by paying off the debt to Polos on the Park and providing  birth certificates for all occupants.  DE 74, Ex. F.  There was no requirement that the Heads move into a larger unit.

**There is no Competent Evidence, Sufficient to Create a
Genuine Issue of Material Fact, of a Similarly Situated Applicant**

Portofino has presented evidence that it had a policy of automatically denying residency to any applicant that had an outstanding debt to a prior landlord, and that the policy was consistently followed.  M. Simpson Decl., May 21, 2009; M. Simpson Depo. at 29.  Without analysis or discussion regarding what makes someone "similarly situated" or a proper comparator, Plaintiffs state: "Rubin Salceda and Bernard Bush were both tenants of Portofino at the time in question.  Both lived with their wives, neither of whom were required to even apply for tenancy."  *See* Plaintiffs' Statement of Facts, ¶ 17.  For this proposition, Plaintiffs rely solely on Head's deposition wherein he states that he learned these facts from Salceda and Bush.  DE 83.  What Head was told by another to prove the truth of the matter asserted is inadmissible hearsay and as such is inadequate to show disparate treatment.  Fed. R. Evid. 801(a), (b) and (c); *see Alvarez v. Royal Atlantic Developers, Inc.,* 610 F.3d 1253, 1268 n.10 (11th Cir. 2010)(plaintiff's testimony about what she heard secondhand is inadmissible hearsay which cannot be used to defeat summary judgment). These alleged statements do not fall within any hearsay exception.  Fed. R. Evid. 803, 804, 807.

Plaintiffs also assert that Misty Simpson, who worked in different capacities at various times in the management office at Portofino,[13] told Head that she had bad credit when she first came to live at Cornerstone.  N. Head Depo. at 107.  Plaintiffs assert this

---

[13]  *See* M. Simpson Depo. at 4-9.

statement is a party admission, not hearsay.  *See* Fed. R. Evid. 801(d)(2).   Rule

801(d)(2)(D) treats as party admissions statements by the party's agent or employee if

they were made during the employment and the statement relates to a matter within

the scope of the agency or employment.

Inquiries relating to an employment relationship and its scope must be treated as

preliminary questions to be established to a judge's satisfaction by a preponderance of

the evidence under Fed. R.  Evid. 104(a).  *See Bourjaily v. United States*, 483 U.S. 171,

180 (1987).  Thus, the district court may consider the declarant's statements in

determining these issues, but must also require some independent proof of the

existence of the agency and its scope.  *Davila v. Corporacion De Puerto Rico Para La*

*Difusion Publica*, 498 F.3d 9, 17-18 (1st Cir. 2007); *Marcic v. Reinauer Transp.*

*Companies*, 397 F.3d 120, 128-29 (2d Cir. 2005); *Hill v. Spiegel, Inc.*, 708 F.2d 233, 237

(6th Cir. 1983); *Oki Am., Inc. v. Microtech Int'l, Inc.*, 872 F.2d 312, 314 (9th Cir. 1989);

*Breneman v. Kennecott Corp.*, 799 F.2d 470, 473 (9th Cir.  1986); *Sorensen v. City of*

*Aurora*, 984 F.2d 349, 354 (10th Cir. 1993).

Plaintiffs have presented no evidence in this regard.  Plaintiffs have not met their

burden of proof that Ms. Simpson's statement was made within the scope of her

employment.  First, there is no time frame given by Plaintiffs as to when this statement

was made.  Second, Head applied to reside at Portofino in January of 2004.  At that

time, Ms. Simpson only held the position of Administrative Assistant.  In late 2004 and

early 2005, when the credit history issue came to the forefront, Ms. Simpson held the

position of Assistant Manager.  M. Simpson Depo. at 7-8.  Ms. Simpson testified that

while Assistant Manager (and presumably while holding the lower level position of

Administrative Assistant), her job duty did not involve reviewing credit reports or

approving applications.  M. Simpson Depo. at 30.  The mere fact Ms. Simpson was an

employee of Defendants at the time the statement was made is insufficient.  *Jacklyn v.*

*Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 928 (6th Cir. 1999).

Even had Plaintiffs presented sufficient evidence to establish the statement was

made within the scope of Ms. Simpson's employment, the only relevance such a

statement would have is if Plaintiffs were presenting her as a comparator in an attempt

to create a genuine issue of material fact as to dissimilar or disparate treatment, or in

an attempt to show pretext.  But Plaintiffs have not presented *any* evidence that Ms.

Simpson meets the requirements of a comparator, *i.e.*, that Ms. Simpson was "similarly

situated," in that she owed a debt to a prior landlord when she moved in, and that she

was outside the protected class.  Ms. Simpson allegedly stated she had bad credit, not

that she had an outstanding debt to a former landlord or to a utility.  *Wilson v. B/E*

*Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004) (plaintiff must show that someone

outside the protected category who is similarly situated to themselves in all relevant

respects was treated more favorably); *see also Burke-Fowler v. Orange County, Fla.*,

447 F.3d 1319, 1323 (11th Cir. 2006) (it is required that the quantity and quality of the

comparator's conduct be nearly identical); *Alansari v. Tropic Star Seafood Inc.*, No.

09-12714, 2010 WL 2853652, *1 (11th Cir. July 22, 2010) (a plaintiff fails to establish a

prima facie disparate treatment case if he fails to show that he was treated less favorably than a similarly-situated person outside his protected class).

If Plaintiffs are presenting her in an attempt to show pretext, this attempt fails. The issue of pretext only comes under scrutiny after Plaintiffs have established a prima facie case, Defendants have articulated some legitimate, nondiscriminatory reason for its action, and then Plaintiffs have the opportunity to prove that the legitimate reasons asserted by the defendant are in fact mere pretext. *United States Dep't of Housing and Urban Dev. v. Blackwell,* 908 F.2d 864, 870 (11th Cir. 1990).  Because the Court concludes that Defendants have demonstrated that there are no genuine issues of material fact which can be supported with competent evidence relative to Plaintiffs' prima facie case, the question of pretext is irrelevant. Accordingly, summary judgment will be granted on Count A for familial discrimination because Plaintiffs have not raised a genuine issue of material fact that they were qualified, as a complete family unit including Lolitha Head and her credit history, to receive low-income housing assistance, that they were evicted despite their qualifications, or that Defendants approved other similarly situated applicants for low-income housing assistance.

**B.    Florida's Deceptive and Unfair Trade Practices Act**

Count II alleges that Defendants' actions in requiring all adult members of a family to have adequate credit, when one or more members have sufficient credit to rent an apartment, violates Florida's Deceptive and Unfair Trade Practices Act, § 501.204, Fla. Stat. ("FDUTPA").  Compl. ¶ 59.  In response to the motion for summary

judgment, Plaintiffs state that Defendants have engaged in the following unfair, deceptive and unconscionable acts: "(a) steering a family to a larger, more expensive apartment because of a newborn infant; (b) using an individual's credit history to require that a renter pay money to a third party to avoid being evicted; and (c) shifting the terms and conditions of [sic] methods to 'rehabilitate' credit to remain a tenant in one's home." DE 84 at 17.

To state a claim under FDUTPA, Plaintiffs must allege that Defendants engaged in a deceptive act or unfair practice in trade and that Plaintiffs are a person "aggrieved" by the deceptive act or unfair practice. Fla. Stat. § 501.211; *see Klinger v. Weekly World News, Inc.*, 747 F. Supp. 1477, 1480 (S.D. Fla. 1990). "A claim for damages under FDUTPA has three elements:  (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *City First Mortgage Corp. v. Barton*, 988 So.2d 82, 86 (Fla. Dist. Ct. App. 2008) quoting *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. Dist. Ct. App. 2006); *see Kia Motors Am. Corp. v. Butler*, 985 So.2d 1133, 1140 (Fla. Dist. Ct. App. 2008); *KC Leisure, Inc. v. Haber*, 972 So.2d 1069, 1073 (Fla. Dist. Ct. App. 2008).  A deceptive practice is one that is "likely to mislead." *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. Dist. Ct. App. 2000); *see also Fendrich v. RBF, L.L.C.*, 842 So. 2d 1076, 1079 (Fla. Dist. Ct. App. 2003).  An unfair practice is "one that offends established public policy" and is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *PNR, Inc. v. Beacon Property Management, Inc.*, 842 So. 2d 773, 777 (Fla. 2003); *Butland*, 951 So. 2d at 869.  FDUTPA "applies to private causes of

action arising from single unfair or deceptive acts in the conduct of any trade or commerce, even if it involves only a single party, a single transaction, or a single contract." *PNR*, 842 So. 2d at 1279.

Summary judgment will be granted on this count.  Even if the Court were to find that there are genuine issues of material fact as to whether Defendants attempted to steer Plaintiffs to a larger, more expensive unit, which it is not, there can be no actual claim because, as discussed above, Plaintiffs were never required to and never did move to a larger unit.  The other alleged immoral, unethical, oppressive or unscrupulous acts were using Lolitha Head's bad credit history to disapprove Lolitha Head's residency, and to require Lolitha Head to "rehabilitate" her credit in order to remain at Portofino.  As demonstrated above, Defendants were legally authorized to require all adults members of a family to complete an application for occupancy, to perform a credit check, and to base an eligibility determination on an applicant's credit history.  This Court concludes that if Defendants' actions do not violate the federal and state housing laws, they cannot constitute a violation of FDUTPA.

C.      Interference, Coercion, or Intimidation

Count IV alleges violations of 42 U.S.C. § 3617 and § 760.37, Fla. Stat., because Defendants refused to accept rent from Plaintiffs and as a result of "this harassment, retaliation and discrimination, Plaintiffs are posed with the requirement to immediately vacate their apartment" in total and reckless disregard of their federally protected rights.   Compl. ¶¶ 76, 78.  Head declares that he went to the office and attempted to

pay rent on March 23, 2005.  He "was told that the matter could be stopped if [he] paid $227 in attorneys fees."  DE 83, N. Head Decl. ¶ 19.  He accepted the offer and went to get a check.  When he returned he was told that Portofino's attorney had instructed them not to accept his check.  *Id*. ¶ 20.  Plaintiffs argues "that there could be no other explanation other than retaliation for the refusal to accept full past due rent and attorneys fees immediately prior to the eviction on March 23rd."  DE 94 at 3.  The Court disagrees.

It is undisputed that Defendants first became aware of any "protected activity" on or about February 17, 2005, when Plaintiff's charge of discrimination was received.  That date is ten days after CRM wrote to the Heads that it would not accept rent for February.  *See* DE 75, Undisputed Facts, ¶ 23.  Therefore, the return of the February rent check cannot be retaliatory as a matter of law.  As discussed previously, Defendants' reason for refusing to allow the Heads to continue residency at Portofino was not pretextual. Rather, the Heads were no longer qualified to reside at Portofino.  Plaintiffs do not dispute that the three day notice was posted on their door on March 15, 2005.  That was nine days before Defendants learned of Mr. Dietz' appearance as Plaintiffs' counsel on March 24, 2005.  *Id*. ¶ 32.  Plaintiffs also do not dispute that they were given until close of business on March 21, 2005 to pay rent and *indicate their willingness to pay off the Polos on the Park debt.  Id*. ¶ 31.  The refusal to accept full past due rent and $227 for attorneys fees occurred on March 23, 2005, one day before Mr. Dietz called Defendants to inform them of his representation.  Plaintiffs seem to be

arguing that Defendants immediately should have halted their ongoing eviction action upon Mr. Dietz' appearance, and failure to do so was retaliation.  The close temporal proximity between Mr. Dietz' appearance and Defendants' prior refusal of Head's tender of past due rent and $227 in attorney's fees does not establish retaliation.

Accordingly, because there is no legally sufficient evidentiary basis for a reasonable jury to find for Plaintiffs, it is hereby

ORDERED AND ADJUDGED that Defendants' Motion for Summary Judgment [DE 74] is GRANTED.  In accordance with Fed.R.Civ.P. 58, final judgment will be entered  by separate order.

DONE AND ORDERED in Chambers at West Palm Beach, Palm Beach County, Florida, this 22nd day of September, 2010.

_____
KENNETH A. MARRA
United States District Judge

copies to:

All counsel of record
Magistrate Judge Linnea R. Johnson